## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| COUNCIL ON AMERICAN-ISLAMIC RELATIONS – MINNESOTA and LEAGUE OF WOMEN VOTERS OF MINNESOTA, | Civil Action No. |
| Plaintiffs, | **COMPLAINT** |
| v. | |
| ATLAS AEGIS LLC, ANTHONY CAUDLE, JOHN DOES #1-10, | |
| Defendants. | |

Plaintiffs Council on American-Islamic Relations—Minnesota ("CAIR-Minnesota"), and League of Women Voters of Minnesota ("LWVMN"), for their complaint allege:

## INTRODUCTION

1.      Atlas Aegis LLC ("Atlas"), its Chairman, Anthony Caudle, and an unnamed "consortium" of individuals and businesses are deploying armed ex-soldiers to intimidate and threaten eligible voters who want to vote, advocate for and support political candidates, and express their political beliefs. Minnesota Senator Amy Klobuchar described Defendants' plan as "clear voter intimidation" during the United States Supreme Court confirmation hearing on October 13, 2020. Sending private, armed militias to Minnesota's polling stations violates federal law. It must be stopped.

1

2.      Defendants have already intimidated voters with the threatening statement that they are actively recruiting armed former Special Operations military personnel to send to polling locations in Minneapolis to target perceived "antifa" members and supporters of the Black Lives Matter movement. This public threat has already chilled voter activity.

3.      Defendants' objective is to further intimidate people with certain political beliefs from accessing polling locations through the presence of armed, highly trained, and elite security personnel. Defendants' threat is terrifyingly credible given the concrete steps they have already taken to recruit those armed personnel, particularly considering the context of broader intimidation efforts targeting voters and activists in Minnesota and elsewhere in the United States.

4.      Defendants' attempt to sabotage a free and fair election has the purpose and effect of intimidating Americans from voting, trying to vote, helping others to vote, supporting or advocating for certain political beliefs, or exercising the right to speak, peaceably assemble, or petition the government for redress of grievances, in violation of Section 11(b) of the Voting Rights Act of 1965, 52 U.S.C. § 10307(b).

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343 because this action arises under Section 11(b) of the Voting Rights Act of 1965, 52 U.S.C. § 10307(b).

6.    This Court has authority to issue declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202.

7.    Venue in this district is proper under 28 U.S.C. § 1391 because a substantial part of the events giving rise to this claim occurred in this District, and all Defendants are subject to personal jurisdiction in this District.

## PARTIES

8.    Plaintiff Council on American-Islamic Relations—Minnesota ("CAIR-Minnesota") is a non-profit civic engagement organization with the mission to enhance the understanding of Islam, encourage dialogue, protect civil liberties, empower American Muslims, and build coalitions that promote justice and mutual understanding. CAIR-Minnesota regularly works directly with the Muslim Minnesotan community (comprised predominantly of people of East African descent) on civic engagement activities, including get-out-the-vote efforts. CAIR-Minnesota has diverted money, time, and other resources towards civic engagement and election support in order to address Defendants' intimidation tactics.

9.    Plaintiff League of Women Voters of Minnesota ("LWVMN") is a non-profit civic engagement organization with the mission to encourage informed and active participation in government, increase understanding of major public policy issues, and influence public policy through education and advocacy.  LWVMN works with Minnesotans to conduct state and local advocacy, voter registration and engagement, civic education, and member enrichment programs.  LWVMN is nonpartisan, neither

3

supporting nor opposing candidates or political parties at any level of government, but always working on vital issues of concern to members and the public. LWVMN has approximately 2,400 members throughout Minnesota. Because voter intimidation is a vital issue of concern to LWVMN members and the public, LWVMN has diverted money, time, and other resources from its vital election-year civic engagement and election support programs in order to address Defendants' intimidation tactics.

10.     Defendant Atlas is a private security company based in Franklin, Tennessee. It is incorporated in Kentucky, Tennessee, and Texas. It was formed approximately thirteen months ago, in August 2019. On its website, it advertises "risk management services" staffed by "elite security teams of veterans and first responders."[1] Its stated mission is to provide "a level of security rarely seen outside of U.S. Special Operations."[2] According to its public statements, it transacted business in Minnesota related to this action by retaining clients in Minnesota, and was working with a Minnesota security firm to send an armed militia to polling locations in Minnesota and, specifically Minneapolis and St. Paul; it has also sought to hire an armed militia for work to be done in Minnesota. It has injured Minnesota residents by threatening that an armed militia would be present at polling places.

11.     Defendant Anthony Caudle is a resident of Tennessee and the Chairman of Atlas. Mr. Caudle's biography on Atlas's website describes a long career in the military

---

[1] *See* Atlas Aegis, *About Us*, https://www.atlasaegis.com/about/ (last visited 10/20/2020,12:15 AM).

[2] *Id.*

4

and in law enforcement.[3] Caudle injured voters in Minnesota by threatening that an armed militia would be present at polling places. Upon information and belief, as Atlas's Chairman, Caudle has also been transacting business in Minnesota related to this action, including by working with the clients that retained Atlas, working with the Minnesota security firm (John Doe 1), and seeking to hire an armed militia for work to be done in Minnesota.

12.     Defendant John Doe 1 is an unknown security firm partnering with Atlas in its efforts to deploy armed former military personnel to polling places in Minnesota and described by Atlas as "a locally licensed firm in Minnesota."[4] Mr. Caudle has referred to John Doe 1 in a media interview as the prime contractor in the effort to deploy armed former soldiers to Minnesota polling locations.[5]

---

[3] *Id.*

[4] *See* Steve Fisher, *ARMED SECURITY FOR NOVEMBER ELECTIONS AND POST ELECTION SUPPORT MISSIONS | MSP/MINNESOLTA – POC IN LISTING*, Marine Executive Association (Oct. 7, 2020), https://www.marineea.org/hotjobs/job/armed-security-for-november-elections-and-post-election-support-missions-mspminnesolta-poc-in-listing/ (last visited Oct. 20, 2020, 12:15 AM).

[5] *See* Joshua Partlow, *Former Special Forces sought by private security company to guard polling sites in Minnesota, company says*, Wash. Post. (Oct. 9, 2020), https://www.washingtonpost.com/politics/private-security-minnesota-election/2020/10/09/89766964-0987-11eb-991c-be6ead8c4018_story.html (hereinafter "Partlow, Wash. Post.").

13.     John Doe Defendants 2-10 are the members of a "consortium of business owners and concerned citizens" described by Mr. Caudle as the clients who hired John Doe 1 and Atlas to send armed former soldiers to Minnesota polling locations.[6]

### FACTS

14.     On and around October 6, 2020, Atlas posted an advertisement on its Facebook page titled "ARMED SECURITY NOVEMBER ELECTIONS and POST ELECTION SUPPORT MISSIONS."[7]

15.     The following is a screen capture of the advertisement:

---

[6] *Id.*

[7] The advertisement has since been deleted from the public Facebook page.



16.     The advertisement was also placed on job posting websites, including

SpecOpsNet.org, which announces positions primarily in the defense industry,[8] and the

website of the Marine Executive Association, which describes itself as a "national,

volunteer, non-profit organization of former and current active duty Marines," with a

_____

[8] *See* SpecOpsNet.org, http://specopsnet.org/ (last visited Oct. 20, 2020, 12:15 AM).

membership consisting of "Marines from all ranks and [Military Occupational

Specialties] who have agreed to contribute their civilian job hunting and hiring

experiences to fellow Marines."[9]

17.    The advertisement described the place of work as the Minneapolis and St.

Paul area of Minnesota. It stated that Atlas "is staffing security positions in Minnesota

during the November Election and beyond to protect election polls."

18.    The advertisement solicited applications from former "Tier 1 and Tier 2

SOF personnel only," further stating that "[t]o be considered for this assignment A [sic]

SOF background is mandatory." Mr. Caudle later confirmed in a media interview that

"SOF" refers to former U.S. military Special Operations Forces personnel.[10]

19.    Media reports describe these "Tier 1 and Tier 2" Special Operations Forces

as classifications for elite forces that include units that have conducted kill-and-capture

missions in Iraq and Afghanistan.[11]

20.    The advertisement noted that Atlas was working with John Doe 1, a locally

licensed Minnesota security firm, and that its purpose was to provide staffing to John Doe

---

[9] *See* Steve Fisher, *ARMED SECURITY FOR NOVEMBER ELECTIONS AND POST ELECTION SUPPORT MISSIONS | MSP/MINNESOLTA – POC IN LISTING*, Marine Executive Association (Oct. 7, 2020), https://www.marineea.org/hotjobs/job/armed-security-for-november-elections-and-post-election-support-missions-mspminnesolta-poc-in-listing/ (last visited Oct. 20, 2020, 12:15 AM); *ABOUT THE MEA*, Marine Executive Association, https://www.marineea.org/index.php/about-the-mea/about-us (last visited Oct. 20, 2020, 12:15 AM).

[10] *See* Joshua Partlow, Wash. Post.

[11] *See id.*

1. The advertisement also provided detailed instructions related to licensing procedures in Minnesota.

21.     The advertisement stated a compensation for recruits of $910 per day, including $700 in salary and $210 in per diem benefits.

22.     The advertisement directed interested individuals to apply through Atlas's website, at https://www.atlasaegis.com/careers/. That webpage contains a detailed electronic application soliciting personal and career information.

23.     Following Atlas's placement of the classified ads soliciting applications from former military special operations forces personnel, several media outlets produced reports detailing the content of the advertisements and concerns over potential voter intimidation.[12]

24.     In an interview with the Washington Post, published on October 9, 2020, Mr. Caudle made statements confirming the authenticity of the Atlas job advertisements and further discussed their purpose.[13]

---

[12] *See, e.g.*, '*Every MN Voter Should Feel Confident': Sec. Of State Responds To Report Ex-Special Forces Being Recruited To Guard Polling Places*, CBS Minnesota (Oct. 9, 2020), https://minnesota.cbslocal.com/2020/10/09/every-mn-voter-should-feel-confident-sec-of-state-responds-to-report-ex-special-forces-being-recruited-to-guard-polling-places/; Mike Mullen, *This story about ex-soldiers guarding Minnesota election sites is terrifying*, City Pages (Oct. 9. 2020), http://www.citypages.com/news/this-story-about-ex-soldiers-guarding-minnesota-election-sites-is-terrifying/572690121; Tierney Sneed, *WaPo Details Security Firm's Plans to Send Ex-Special Ops Personnel to Polling Places*, Talking Points Memo (Oct. 9, 2020), https://talkingpointsmemo.com/news/wapo-details-security-firms-plans-to-send-ex-special-ops-personnel-to-polling-places.

[13] *See* Joshua Partlow, Wash. Post.

25.     Mr. Caudle stated that he is planning to send a "large contingent" of armed former soldiers to Minnesota. Mr. Caudle refused to provide an exact number of former soldiers involved or clarify any further details as to where in Minnesota the armed men would be sent.

26.     In the interview, Mr. Caudle confirmed that Atlas's efforts were aimed at people with specific political beliefs, stating that Defendants sought to deter perceived members of "the [a]ntifas" from "destroy[ing] the election sites."

27.     Mr. Caudle further threatened that the armed, highly trained agents would act "when there is an issue" and confront perceived "antifa" members and supporters of the Black Lives Matter movement.

28.     Referencing the protests that broke out in Minneapolis following the murder of George Floyd in May 2020, Mr. Caudle stated that "[u]nfortunately back when the first antifa and Black Lives Matter protests were happening, the entire country was left completely unprepared," adding that "we're just going to do our absolute A-number-one best to make sure that that doesn't happen this time around."[14]

29.     Mr. Caudle's media interview admits that Defendants' goal is specifically to deter perceived members of certain groups based on political belief and race. Defendants have publicly threatened that their armed agents will confront perceived members of those groups should their armed agents subjectively determine that "there is an issue."

---

[14] *Id.*

10

30.     Defendants' intentional recruitment of armed, highly trained, and elite former military personnel in the context of "protecting" the polls serves no purpose other than to intimidate voters. A cover profile of Atlas's Chief Operating Officer Michael Beltran in "Soldier of Fortune" magazine illustrates the intimidating nature of Defendants' public image and that of the types of special forces personnel that Defendants have threatened—and intend—to deploy at polling places in Minnesota:



31.     Defendants themselves recognize that armed agents will intimidate potential voters. In an article on Atlas's website entitled "Proof of Congregational Security," Atlas's Executive Vice President Dr. D. Gregory Wark details strategies to protect church congregations. He writes: "We need to make our buildings of worship look inviting to those who need to be there but also menacing to those who seek to do harm. ***Armed uniformed security personnel will always look menacing***…" (emphasis added).[15]  Deploying armed agents will present a menacing obstacle to voters seeking access to the polls.

**Public Reaction to the Atlas Campaign**

32.     On October 13, 2020, Minnesota Senator Amy Klobuchar recounted Defendants' plans during a nationally televised United States Supreme Court confirmation hearing, and stated Defendants' efforts are "clear voter intimidation."

33.     Minnesota's Attorney General Keith Ellison released a statement "strongly discouraging this unnecessary interference in Minnesota's elections, which we have not asked for and do not welcome" and clarifying that "[t]he presence of armed outside contractors at polling places would constitute intimidation and violate the law." He further requested that Defendants "cease and desist any planning and stop making any statements about engaging in this activity."[16]

---

[15] *See* Dr. D. Gregory Wark, Executive Vice President, *Proof of Congregational Security*, Atlas Aegis, https://www.atlasaegis.com/proof-of-congregational-security/ (last visited Oct. 20, 2020, 12:15 AM) (emphasis added).

[16] *See* Joshua Partlow, Wash. Post.

12

34.     Responding to media reporting on Defendants' activities, Minnesota Secretary of State Steve Simon stated that the presence of armed agents would not help law enforcement but instead would "mak[e] things more difficult."[17]

35.     Minneapolis City Clerk Casey Carl responded to Defendants' plans by observing that he "could appreciate how voters could interpret that as intimidation" and that he would not authorize Defendants to be at the city's polling places.[18]

36.     Members of the public have also reacted to reporting on Defendants' actions by expressing the fear and intimidation Defendants have caused. Some media reports have generated hundreds of public comments. Examples of comments to an article in a local Minnesota publication, the Star Tribune, include:

- "Whether they come to the polls or not, the 'fear' has already done its job in making someone afraid to vote."

- "They will scare a good number of thin-skinned young adults who are voting for the first time. Being so young and inexperienced, they will lack the emotional fortitude to ignore the creeps."

- "This is election interference. They have no authority to guard a polling place, and I hope that local authorities are on top of the threat to citizens."

- "It is nothing more than an intimidation ploy."[19]

---

[17] *Id.*
[18] *Id.*

[19] *See* Andy Mannix, *Private security company recruiting armed military veterans to guard Minnesota polls from 'Antifas' in November election*, Star Tribune (Oct. 10, 2020), https://www.startribune.com/private-security-company-recruiting-armed-veterans-to-guard-minnesota-polls-from-antifas-in-election/572692242/.

13

**Recent Attempts at Voter Intimidation in Minnesota and Neighboring States and Encouragement of Vigilante Activity**

37.     Defendants' threats are objectively intimidating and credible on their own. But they have greater weight and impact given recent, highly publicized attempts at voter suppression, attacks on public speech and assembly, and politically motivated violence by vigilante and so-called "militia" groups in Minnesota and neighboring states.

38.     For example, at the end of September, Project Veritas, a group led by political activist James O'Keefe, released a deceptive video which falsely claimed that Minnesota Congressional Representative Ilhan Omar's campaign had illegally collected ballots in Minnesota. This video appeared as part of a coordinated disinformation effort and prompted an investigation by the Minneapolis Police Department.[20] The impact of this voter suppression campaign was exacerbated when President Trump repeated the false allegations at a rally in Duluth, Minnesota on September 30, 2020.[21]

39.     In addition, armed vigilante groups have recently targeted perceived members of "antifa" and supporters of Black Lives Matter during recent protests. These

---

[20] *See* Maggie Astor, *Project Veritas Video Was a 'Coordinated Disinformation Campaign,' Researchers Say*, N.Y. Times (Sep. 29, 2020), https://www.nytimes.com/2020/09/29/us/politics/project-veritas-ilhan-omar.html.

[21] *See* Aaron Rupar, *Demonizing Somalis is at the heart of Trump's Minnesota strategy. His Duluth rally showed it.*, Vox (Oct. 1, 2020), https://www.vox.com/2020/10/1/21496814/trump-duluth-rally-ilhan-omar-refugees.

assemblies have been directly linked to protected election-related speech and
associational activity.[22]

40.     President Trump explicitly attributed the ongoing Black Lives Matter
protests to Former Vice President Biden and his supporters and characterized the protests
as related to the 2020 general election. He also described the phrase "Black Lives Matter"
as a "symbol of hate."[23] President Trump and Attorney General Bill Barr have sought to
intimidate people who have participated or might participate in these assemblies by trying
to link them to "antifa," a loose movement of self-described antifascist activists, which
President Trump and Attorney General Barr have falsely portrayed as an organized
terrorist network.[24]

41.     In the neighboring state of Wisconsin, a man named Kyle Rittenhouse was
arrested and charged with two counts of first degree homicide and one count of attempted
suicide for allegedly traveling to the city of Kenosha with his assault weapon and

---

[22] *See* Safia Samee Ali, *Where protesters go, armed militias, vigilantes likely to follow*,
NBC News (Sept. 1, 2020), https://nbcnews.to/2RdYPhi.

[23] *See* Donald J. Trump (@realDonaldTrump), Twitter (July 1, 2020, 9:48 AM),
https://twitter.com/realDonaldTrump/status/1278324680311681024("NYC is cutting
Police $'s by ONE BILLION DOLLARS, and yet the @NYCMayor is going to paint a
big, expensive, yellow Black Lives Matter sign on Fifth Avenue, denigrating this luxury
Avenue. This will further antagonize New York's Finest, who LOVE New York &
vividly remember the….,"); Donald J. Trump (@realDonaldTrump), Twitter (July 1,
2020, 9:48 AM), https://twitter.com/realDonaldTrump/status/1278324681477689349
("….horrible BLM chat, 'Pigs In a Blanket, Fry 'Em Like Bacon.' Maybe our GREAT
Police, who have been neutralized and scorned by a mayor who hates & disrespects them,
won't let this symbol of hate be affixed to New York's greatest street. Spend this money
fighting crime instead!").

[24] *See* Donald J. Trump (@realDonaldTrump), Twitter (May 31, 2020, 12:23 PM),
https://twitter.com/realDonaldTrump/status/1267129644228247552.

15

shooting and killing people who were protesting the recent police shooting of Jacob Blake.[25]

42.     In the neighboring state of Michigan, on April 30, 2020, armed militants stormed the Michigan Capitol building, returned two weeks later, and made specific violent threats against Michigan lawmakers.

43.     Thirteen men were arrested and charged with plotting to kidnap the Governor of Michigan on October 8, 2020. An FBI agent testified that the Governor of Virginia was also a potential target of this domestic terrorism plot.

44.     Given this recent history of political agitation and violence targeting people with the same perceived political beliefs as those targeted by Defendants, Defendants' threats are imminently and objectively intimidating and credible.

**CAIR-Minnesota and LWVMN Seek to Address Defendants' Intimidation Tactics**

45.     Both CAIR-Minnesota and LWVMN expect that many people who are intimidated by threats of violence at polling places will choose to remain at home and lose their right to vote.

46.     These direct threats of violence resonate with other acts of intimidation against Minnesota's Muslims. For example, in 2017, an online "contest" called "Punish a Muslim Day," which awarded points to those who uploaded proof that they had harmed Muslims, led many Muslim Minnesotans to keep their children home from school. The

---

[25] *See* Matthew Choi, *Trump defends gunman charged with murdering 2 in Kenosha*, Politico (Aug. 31, 2020), https://politi.co/3jCvklP.

prospect of violence against the local Muslim community during the election period is

particularly immediate given that a trial concerning the 2017 Bloomington, Minnesota

mosque bombing is set to begin the one day before Election Day on November 2, 2020.

47.     In addition, the image of armed vigilantes at polling stations is particularly

traumatic and deleterious to voter participation for people who have recently immigrated

to the United States from countries where armed guards at polling stations are a symbol

of violence and corruption.

48.     Finally, since the killing of George Floyd and the resulting protests,

Minnesotans face the added fear of White Supremacists and vigilante groups seeking to

escalate violence at sites of political protest.

49.     While some Minnesota voters use mail-in ballots, many of CAIR-

Minnesota's members vote in person. Others who might have chosen to elect to mail their

ballots because of the Atlas threat may learn of the threat too late to request mail-in

ballots. Because of the timing and nature of the Atlas plan, the likelihood of CAIR-

Minnesota members not voting if nothing is done to remedy this threat is extremely high.

50.     CAIR-Minnesota has been forced to divert resources on an emergency basis

to preserve Minnesotans' right to vote free from intimidation.

51.     CAIR-Minnesota has diverted resources from projects at the heart of its

mission, such as educating voters about issues that are relevant to their communities and

combating discrimination against Muslim Minnesotans in issues ranging from

employment, public accommodation, and school discrimination to hate crimes and

governmental religious/racial profiling. It has also diverted the resources of its staff to reach out to law enforcement to address the potential for voter intimidation. CAIR-Minnesota will continue to divert its resources, impeding its ability to perform its mission, unless and until Defendants' intimidation tactics stop.

52.     The damage from the Atlas campaign to undermine voter participation in the electoral process is an attack on the right to vote that is at the core of CAIR-Minnesota's mission.

53.     As part of its voter engagement programs, LWVMN participates in outreach to help register voters, including helping new Americans register to vote at naturalization ceremonies. Defendants' direct threats of violence have had a chilling effect on participation by these voters, many of whom are apprehensive about voting for the first time, or in the case of many new Americans, have immigrated to the United States from countries where armed militias at polling stations are a symbol of violence and corruption.

54.     Like CAIR-Minnesota, many of LWVMN's members vote in person. Others who might have elected to vote by mail because of the Atlas threat may learn of the threat too late to request mail-in ballots. The Atlas threat will also directly interfere with new voters who are intimidated form attending the polls but could otherwise avail themselves of in-person-only same-day registration on Election Day. Because of the timing and nature of the Atlas plan, the likelihood of LWVMN members not voting if nothing is done to remedy this threat is extremely high.

55.     LWVMN has also been forced to divert resources on an emergency basis to preserve Minnesotans' right to vote free from intimidation.

56.     LWVMN has diverted resources from projects at the heart of its mission, including its legislative observer and volunteer lobbying programs, legislative publications, candidate forums, voter education programs at new citizen ceremonies, voter registration programs, and civic education programs, among others. It has also diverted the resources of its staff to reach out to law enforcement to address the potential for voter intimidation. LWVMN will continue to divert its resources, impeding its ability to perform its mission, unless and until Defendants' intimidation tactics stop.

## CLAIM FOR RELIEF

### COUNT ONE
**Intimidating or Attempting to Intimidate Voters and Those Aiding Them in Violation of Section 11(b) of the Voting Rights Act of 1965**

57.     Plaintiffs reallege and incorporate by reference as if fully set forth herein each of the preceding paragraphs and allegations.

58.     Section 11(b) of the Voting Rights Act of 1965 (VRA), 52 U.S.C. § 10307(b), provides:

> No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote, or intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for urging or aiding any person to vote or attempt to vote, or intimidate, threaten, or coerce any person for exercising any powers or duties under [other provisions of this law].

59.     Defendants' intimidating, threatening, and coercive conduct includes publicly threatening to deploy armed former military personnel to intimidate voters and political activists perceived to be supporters or members of "antifa" and Black Lives Matter, and taking concrete steps in furtherance of that deployment by recruiting armed former military personnel and publicizing their efforts.

60.     Defendants have engaged in this conduct with the subjective intent to threaten, intimidate, and coerce voters and those who would lawfully aid eligible persons attempting to vote, and with the knowledge that the natural consequences of their conduct and speech will be the intimidation of such voters and those who would lawfully aid such persons attempting to vote.

61.     Defendants' conduct has actually intimidated voters and those who would lawfully aid persons attempting to vote.

62.     Defendants have violated 52 U.S.C. § 10307(b) and will continue to do so absent judicial relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

a. Declare that Defendants' statements and actions already taken towards recruiting and deploying armed military personnel to polling places constitute unlawful voter intimidation in violation of Section 11(b) of the Voting Rights Act.

b. Order Defendants to cease recruitment of armed agents for the purpose of sending those agents to or near polling locations while polling is underway.

c. Order Defendants not to deploy armed agents at or near polling places nor to engage in other actions that may intimidate voters or interfere with voter access to polling locations while voting or the counting of votes is underway, at any time

prior to and during the general election on November 3, 2020 or the counting of the votes for electors thereafter.

d.  Award Plaintiffs reasonable attorneys' fees and costs.

e.  Retain jurisdiction to ensure Defendants' ongoing compliance with the foregoing orders.

f.  Grant such other and further relief that this Court deems just and appropriate.


Date: October 20, 2020                         Respectfully submitted,

                                                s/ Julia Dayton Klein

                                               **LATHROP GPM LLP**
                                               Julia Dayton Klein (MN Bar #0319181)
                                               Amy Erickson (MN Bar #0399214)
                                               500 IDS Center
                                               80 South 8th Street
                                               Minneapolis, MN 55402
                                               Julia.DaytonKlein@lathropgpm.com
                                               Amy.Erickson@lathropgpm.com
                                               (612) 632-3153
                                               (612) 632-3470

                                               **EMERY CELLI BRINCKERHOFF**
                                               **ABADY WARD & MAAZEL LLP**
                                               Jonathan S. Abady*
                                               Mathew D. Brinckerhoff*
                                               O. Andrew F. Wilson*
                                               Debra L. Greenberger*
                                               Vivake Prasad*
                                               600 Fifth Avenue, 10th Floor
                                               New York, NY 10020
                                               Tel: 212-763-5000
                                               jabady@ecbawm.com
                                               mbrinckerhoff@ecbawm.com
                                               awilson@ecbawm.com
                                               dgreenberger@ecbawm.com

                                               **FREE SPEECH FOR PEOPLE**
                                               Ronald Fein*

21

John Bonifaz*
Ben Clements*
1320 Centre Street, Suite 405
Newton, MA 02459
Telephone: (617) 244-0234
jbonifaz@freespeechforpeople.org
rfein@freespeechforpeople.org
bclements@freespeechforpeople.org

**ATTORNEYS FOR PLAINTIFFS**

*Motions for admission *pro hac vice*
forthcoming

GP:4812-3828-8335 v1

22