# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| COUNCIL ON AMERICAN-ISLAMIC RELATIONS – MINNESOTA AND LEAGUE OF WOMEN VOTERS OF MINNESOTA, <br><br> Plaintiffs, <br><br> v. <br><br> ATLAS AEGIS LLC, ANTHONY CAUDLE, JOHN DOES #1-10, <br><br> Defendants. | Civil Action No. 0:20-cv-02195 <br><br> **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

## INTRODUCTION

Defendants—Atlas Aegis LLC ("Atlas"), its principal, Anthony Caudle, and their clients—are sending armed ex-soldiers to Minnesota's polling sites. They are targeting what they call "antifas" and those who support "Black Lives Matter." Deploying armed guards in the middle of a federal election is, as U.S. Senator Amy Klobuchar recognized, "clear voter intimidation."[1] And it chillingly resonates with the recent rise of vigilante extremism—like the thwarted conspiracy to kidnap Michigan's Governor and the killing of Black Lives Matter protestors in Kenosha, Wisconsin. The threat of privately funded,

---

[1] *See* Klein Decl. Ex. 1 (Office of Senator Amy Klobuchar, *News Release: Klobuchar Denounces Rushed Supreme Court Nomination Process, Presses Judge Barrett on Voting Rights During Second Day of Hearings*, (Oct. 13, 2020), https://www.klobuchar.senate.gov/public/index.cfm/news-releases?ID=5A622DB2-CAD6-47CA-A8AF-B57B63FAC310 (containing transcript of Senator Klobuchar's remarks at the hearing)).

heavily armed, militias prowling polling sites is a direct assault on the Voting Rights Act and our democracy.

Voting has already started in Minnesota. It is being chilled by Defendants' threats. They have placed multiple public advertisements seeking to recruit armed former members of elite military special operations forces to interfere with access to poll sites. They have publicized their recruitment in the media. They have said publicly that their efforts are targeted at people with perceived liberal political beliefs and supporters of Black Lives Matter. These actions are objectively intimidating and have intimidated and threatened voters, the people served by Plaintiffs Council on American Islamic Relations – Minnesota ("CAIR-Minnesota") and the members of League of Women Voters of Minnesota ("LWVMN").

Defendants' recruitment efforts and media statements have become a flashpoint in the national discussion of threats to the November election. In addition to Senator Klobuchar's statement, numerous alarmed Minnesota public officials have implored Defendants to reverse course, including top Minneapolis election official Casey Carl, who stated, "[C]ertainly I could appreciate how voters could interpret [Defendants' plan] as intimidation."[2]

---

[2] Klein Decl. Ex. 2 (Joshua Partlow, *Former Special Forces sought by private security company to guard polling sites in Minnesota, company says*, Wash. Post. (Oct. 9, 2020), https://www.washingtonpost.com/politics/private-security-minnesota-election/2020/10/09/89766964-0987-11eb-991c-be6ead8c4018_story.html#comments-wrapper).

2

An injunction is necessary here to preserve Minnesotans' right to vote. Plaintiffs are likely to succeed on the merits of their claims: Section 11(b) of the Voting Rights Act of 1965 ("VRA") prohibits anyone from intimidating, threatening, or coercing people in connection with voting activities. Defendants have already repeatedly violated this tenet by engaging in a campaign that has predictably caused voters to fear that they will not be able to effectively exercise their right to vote. Defendants will further violate the VRA if they are permitted to follow through on their threats and send armed men to polling places. Plaintiffs, which are organizations committed to voting rights, bring this action because the voters that they work with, as well as other voters across Minnesota, have had their sense of personal security and right to vote free from intimidation shaken by Defendants' actions. With in-person voting already underway and only weeks remaining before Election Day, only an order immediately enjoining further similar conduct can restore voters' faith that Defendants' threats and voter intimidation scheme will not be tolerated. This harm is irreparable; and both the balance of equities and the public interest favor an injunction to preserve the status quo.

## BACKGROUND

On October 6, 2020, in the midst of Minnesota's in-person early voting period, Atlas posted a job advertisement on Facebook, which was then reposted to at least two

additional job listing websites specializing in the defense industry.[3]



The advertisement—with its bolded call for "**ARMED SECURITY**"—informed

applications that Atlas "is staffing security positions in Minnesota during the November

---

[3] *See id.*; Klein Ex. 3 (screen capture of Facebook advertisement); Klein Ex. 4 (job posting on website of Marine Executive Association); Tierney Sneed, *WaPo Details*

Election and beyond to protect election polls." Klein, Ex. 4. It listed Minneapolis and St. Paul as the job location and stated that only former "Tier 1 and Tier 2" special operations forces—a classification of elite forces that reportedly includes soldiers who have conducted kill-and-capture missions in Iraq and Afghanistan—should apply for the position. *Id.* The advertisement quoted a generous daily wage befitting the expertise and experience of such highly specialized ex-soldiers, including $700 in salary and $210 in per diem benefits, and directed applicants to Atlas's website. *Id.*

Atlas's Chairman, Anthony Caudle, publicized in the national media the company's plans to recruit armed former soldiers to send to Minnesota polls, assuring that word of their plan would reach Minnesota voters. In an interview published on October 9th, Caudle told *The Washington Post* that he and his company would be sending a "large contingent" of armed men to Minnesota polls. Klein, Ex. 2. The purpose, according to Caudle, was to prevent perceived "antifas" from "destroy[ing] the election sites." *Id*. He further declared that"[u]nfortunately back when the first antifa and Black Lives Matter protests were happening, the entire country was left completely unprepared," and vowed that "we're just going to do our absolute A-number-one best to make sure that that doesn't happen this time around." *Id*. He promised that their armed agents would confront individuals at the polls if those ex-soldiers believe "there is an issue." *Id*. Finally, he confirmed that his firm had not been hired by election

---

*Security Firm's Plans to Send Ex-Special Ops Personnel to Polling Places*, Talking Points Memo (Oct. 9, 2020 at 3:47pm), https://talkingpointsmemo.com/news/wapo-details-security-firms-plans-to-send-ex-special-ops-personnel-to-polling-places (discussing additional posting on SpecOpsNet.org).

administrators or law enforcement, but by a private group of businesses and individuals whose identities he refused to reveal. *Id*.

Defendants' advertisement and public statements led to public outcry and alarm. Minnesota Senator Amy Klobuchar recounted Defendants' plans during a nationally televised United States Supreme Court confirmation hearing, stating that they were "clear voter intimidation." Klein, Ex. 1. Minnesota Attorney General Keith Ellison released a statement "strongly discouraging this improper interference in Minnesota's elections, which we have not asked for and do not welcome" and clarifying that "[t]he presence of armed outside contractors at polling places would constitute intimidation and violate the law." He demanded that Defendants "cease and desist any planning and stop making any statements about engaging in this activity." Klein, Ex. 2. Minnesota Secretary of State Steve Simon stated that the presence of armed agents would not help law enforcement, but instead would be "making things more difficult." *Id*.

Despite providing an interview to *The Washington Post* to confirm his company's plans to send armed men to Minnesota polls, Caudle refused to comment to the media when informed of Minnesota's elected officials' calls for his company to reverse course. *Id*.

The prospect of armed private militia attending polling stations is of particular concern to Minnesota's Muslim American community, which has been the target of

violent acts by armed vigilantes, including the 2017 Bloomington Mosque bombing.[4] *See* Hussein Decl. ¶ 13. Just last month, Minnesota's Muslim American community was the target of a voter suppression campaign by a group called Project Veritas.[5] At the end of September, Project Veritas released a deceptive video which falsely claimed that the campaign of U.S. Representative Ilhan Omar, a prominent Muslim American Congresswoman from Minnesota, had illegally collected ballots in Minnesota.[6] The video appeared to be part of a coordinated disinformation effort and led to widespread repercussions, including an investigation by the Minneapolis Police Department. *See* Hussein Decl. ¶ 8.

As an organization serving Minneapolis's Muslim American community, Plaintiff CAIR-Minnesota works with many voters and expects that people who are intimidated by threats of violence at polling places will choose to remain at home and lose their right to vote as a result of Defendants' conduct. *See id.* ¶ 9.

Similarly, Plaintiff LWVMN works with voters, including some who have just registered to vote after becoming naturalized American citizens. Like many of CAIR-Minnesota's members, some of these voters are familiar with the threat or use of violence

---

[4] The fear resulting from this incident is especially resonant because the trial of one of the defendants in that bombing is scheduled to begin on November 2, 2020. Hussein Decl. ¶ 13.

[5] Maggie Astor, *Project Veritas Video Was a 'Coordinated Disinformation Campaign,' Researchers Say*, N.Y. Times (Sep. 29, 2020), https://www.nytimes.com/2020/09/29/us/politics/project-veritas-ilhan-omar.html.

[6] *See id.*

to intimidate voters in the countries they left behind. *See* Witte Decl. ¶ 10. LWVMN,

through its civic participation and education programs, serves many citizens who have

been alarmed by recent incidents of violence by armed vigilante groups, including the

recent deadly shooting of protestors in Kenosha, in the neighboring state of Wisconsin, as

well as a plot to kidnap the governor of the neighboring state of Michigan. *See id.* ¶ 5. To

many voters, this recent experience makes Defendants' threats both frightening and

alarmingly credible. *See id.*

A cover profile of Atlas's Chief Operating Officer Michael Beltran in "Soldier of

Fortune" magazine illustrates the intimidating nature of Defendants' public image and

that of the types of special forces personnel that Defendants have threatened, and intend,

to deploy at polling places in Minnesota. *See* Klein Ex. 5.



## ARGUMENT

Injunctive relief should issue where a party demonstrates (1) a likelihood of success on the merits; (2) irreparable harm; and (3) that such an injunction is favored by both the balance of the equities and the public interest. *S.B. McLaughlin & Co., Ltd. v. Tudor Oaks Condo. Project*, 877 F.2d 707, 708 (8th Cir. 1989); *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981). This test is applied in a "flexible" manner appropriate to "the particular circumstances of each case." *Id*. "[W]here the balance of other factors tips decidedly toward plaintiff a preliminary injunction may issue if movant has raised questions so serious and difficult as to call for more deliberate investigation," even if the district court does not conclude that the movant is more than fifty percent likely to succeed on the merits. *Id*.

The threat of a private army descending on Minnesota's polls meets this standard.

## I.   PLAINTIFFS ARE LIKELY TO SUCCEED

Section 11(b) of the Voting Rights Act of 1965 provides a private right of action for injunctive relief against private actors who engage in voter intimidation. *Allen v. State Bd. of Elections*, 393 U.S. 544, 554-56 (1969). The relevant portion of the provision states:

> No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote, or intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for urging or aiding any person to vote or attempt to vote, or intimidate, threaten, or coerce any person for exercising any powers or duties under [other provisions of this law].

52 U.S.C. § 10307(b) (formerly codified at 42 U.S.C. § 1973i(b)).

To succeed on a claim under Section 11(b), Plaintiffs must show Defendants (1) intimidated, threatened or coerced, or attempted to intimidate threaten or coerce, another person (2) in connection with voting, attempting to vote, or urging or aiding another to vote. *See id.*[7]

## A.   Defendants Have Already Intimidated Voters in Connection with Voting

Defendants' words and concrete actions—including their apparent refusal to reconsider after the repudiation of Minnesota's public officials and widespread concerns

---

[7] Both CAIR-Minnesota and LWVMN unquestionably have standing to bring this action. CAIR-Minnesota has been, and will continue to be forced to divert significant resources from its election-year programs to combat Defendants' voter intimidation. Hussein Decl. ¶¶ 19-21; It therefore has direct organizational standing to bring this case. *See Pavek v. Simon*, No. 19 Civ. 3000 (SRN/DTS), 2020 WL 3183249, at *10 (D. Minn. June 15, 2020) (holding that Plaintiff political organizations had standing because they were forced to divert resources to counteract the effects of the statute being challenged in the litigation). Similarly, LWVMN has also been and will continue to be forced to divert significant resources to address Defendants' efforts, and also has direct standing to bring this case. *See* Witte Decl. ¶¶ 11-14. In addition, as a non-profit civic engagement organization with the mission to encourage informed and active participation in government that has over 2,400 members, many of whom are have been intimidated by Defendants' actions from exercising their right to vote, LWVMN has standing on behalf of its members to seek an injunction. *See Id.* ¶¶ 2-7, 13-14; *See Red River Freethinkers v. City of Fargo*, 679 F.3d 1015, 1022 (8th Cir. 2012) (holding that an organization had standing based on behalf of its members in part because the "purpose of promoting atheistic and agnostic views is plainly germane to its members' interest in being free of Establishment Clause violations" and because the form of relief sought – an injunction – "does not make the individual participation of each injured party indispensable to proper resolution of the cause." (quotation marks and citation omitted)); *Club v. U.S. Army Corps of Engineers*, No. 10 Civ. 04017 (WRW), 2010 WL 11484334, at *3 (W.D. Ark. Oct. 27, 2010) (holding that environmental organizations had the "requisite… organizational purpose" to sue on behalf members for environmental damage to an area used by them), *aff'd sub nom. Sierra Club v. U.S. Army Corps of Engineers*, 645 F.3d 978 (8th Cir. 2011).

about the impact on voters—have created an intimidating environment for voters who plan or had planned to vote in person at their polling places. The purpose of Defendants' conduct and their intent to violate the VRA could not be clearer. As the bolded title of their advertisement makes plain: this is an explicit solicitation to deploy "**ARMED SECURITY**"—former special operations soldiers—at Minnesota polling sites

For any voter, especially voters of color, new Americans who experienced military or paramilitary intimidation in the countries they left behind, or those who subscribe to the political beliefs singled out by Defendants, the prospect of being confronted at the polls by a paid army of highly trained soldiers with weapons in hand is terrifying. As Minneapolis city clerk Casey Carl noted to the media, it is not difficult to "appreciate how voters could interpret that as intimidation."[8]

Defendants have already used tactics to intimidate, threaten, and coerce voters, and have publicly admitted plans to escalate further. The words "intimidate," "threaten," and "coerce" have a broad meaning under Section 11(b). The Supreme Court has recognized that Congress intended to give the Voting Rights Act "the broadest possible scope." *Allen*, 393 U.S. at 567. The ordinary meanings of "intimidate," "threaten," and "coerce" are themselves expansive. *Leocal v. Ashcroft,* 543 U.S. 1, 2 (2004) ("When interpreting a statute, words must be given their ordinary or natural meaning." (internal quotation marks and citation omitted)); *see also Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223 (2d Cir. 2001) (letter from company threatening to "address

---

[8] *See* Ex. 2.

[employee's] behavior through legal channels" could be found to "intimidate" or "threaten" the employee in violation of the ADA) (quotation marks omitted). Private, armed militias are intimidating by any definition.

Section 11(b) prohibits Defendants' indirect forms of intimidation as well as more overt forms. According to the Department of Justice, voter intimidation includes a broad range of conduct "intended to force prospective voters to vote against their preferences, or refrain from voting, through activity reasonably calculated to instill some form of fear."[9] The Ninth Circuit, in interpreting California's analogue to Section 11(b), noted that intimidation under that law "is not limited to displays or applications of force, but can be achieved through manipulation and suggestion." *United States v. Nguyen*, 673 F.3d 1259, 1265 (9th Cir. 2012) (finding letter sent to Hispanic voters warning of incarceration or deportation resulting from illegal voting could have "constituted a tactic of intimidation" under California voter intimidation statute)*; see also Democratic Nat'l Comm. v. Republican Nat'l Comm.*, 673 F.3d 192, 209 (3d Cir. 2012) (holding that 1982 consent decree continued to be necessary "to help ensure that potential minority voters are not dissuaded from going to the polling station to vote" because, without it, RNC would likely resume engaging in prohibiting RNC from engaging in certain intimidating "ballot security" activities, such as aggressive poll-watching and reporting registered minority voters as ineligible for having undeliverable addresses); Consent Decree, *United States v. N.C. Republican Party, et. al.*, No. 91-161-CIV-5-F (E.D.N.C Feb. 27, 1992)

---

[9] U.S. Department of Justice, *Federal Prosecution of Election Offenses,* 8th Ed., Dec. 2017, at 52, *accessed at* https://www.justice.gov/criminal/file/1029066/download.

(consent agreement under Section 11(b) prohibiting "ballot security" measures, after party sent thousands of postcards to registered African-American voters warning that it was a federal crime, "punishable by up to five years in jail," to give false information to an election official).

Section 11(b) reaches any *objectively* intimidating act. Conduct that has the "inevitable effect" of discouraging, intimidating, threatening, or coercing people seeking to exercise their right to vote is prohibited. *United States v. Clark*, 249 F. Supp. 720, 728 (S.D. Ala. 1965). As Attorney General Katzenbach explained to Congress when it was considering the Voting Rights Act, defendants in Section 11(b) cases are "deemed to intend the natural consequences of their acts." Voting Rights, Part 1: Hearings on S. 1564 Before the Senate Comm. on the Judiciary, 89th Cong. 16 (1965).

The objective threat underlying Defendants' public job postings and Caudle's media interview is that people with certain perceived political beliefs should be wary of voting because they may be confronted by a paid private army of armed individuals who have received elite military training. These threats are objectively, and subjectively, intimidating. These public statements, which threaten physical violence, violate the VRA. *See Paynes v. Lee*, 377 F.2d 61, 63 (5th Cir. 1967) (white citizens threatened to "destroy" and "annihilate" black man who tried to register to vote). Violently confronting people with certain perceived political beliefs at the polls is also actionable under Section 11(b). *See, e.g.*, *United States v. Wood*, 295 F.2d 772, 776 (5th Cir. 1961) (courthouse official

beat and arrested black voter registration volunteer in front of black residents trying to

register in violation of Section 11(b) predecessor statute).[10]

Defendants have engaged in these classic forms of intimidation here. Caudle made

clear that his agents will be armed. Those armed agents will step in if they perceive

"there is an issue." Defendants intend to send to the polls experienced, armed, and highly

trained former soldiers of elite military units—people whose training is to enforce order

through violence, if necessary—at polling places. They are doing so in an election year

which has seen numerous episodes of violence caused by armed vigilantes taking the law

into their own hands for their own purposes.

Moreover, Defendants recognize that armed agents will intimidate potential

voters. As Atlas's Executive Vice President wrote in an article on Atlas's website on the

particular effectiveness of deploying armed guards as a deterrent, "*Armed uniformed

security personnel will always look menacing…*"(emphasis added).[11] Deploying armed

---

[10] Section 131(b) of the Civil Rights Act of 1957 is Section 11(b)'s predecessor statute. Like Section 11(b), it prohibits "intimidat[ion]," "threat[s]," and "coerc[ion]" in connection with voting. *See* 52 U.S.C. § 10101(b). Under the doctrine of *in pari materia*, courts interpret two similar statutes consistently. *See Northcross v. Bd. of Ed. of Memphis City Schs.*, 412 U.S. 427, 428 (1973) (holding that where a statutory term has similar language to a term in a previously enacted statute, and where the two statutory provisions share a common purpose, the term should be interpreted in light of the previously enacted statute). Section 11(b) was drafted with the intent of replacing and expanding Section 131(b). *See* H.R. Rep. No. 89-439, at 30 (1965).

[11] Dr. D. Gregory Wark, Executive Vice President, *Proof of Congregational Security*, Atlas Aegis (last accessed Oct. 19, 2020), https://www.atlasaegis.com/proof-of-congregational-security/.

14

agents will present a menacing obstacle to voters seeking access to the polls.[12] Despite this knowledge, Defendants apparently refused to back down, even when met by the resistance of local elected officials and media reports expressing concerns over voter intimidation. Minnesota elected officials and voters have taken notice that Defendants' public statements will intimidate voters.

Finally, the intimidating effect of sending—or threating to send—armed guards to polling stations has an obvious nexus with voting under Section 11(b). Section 11(b) protects people who are "voting," "attempting to vote," or "urging or aiding any person to vote or attempt to vote." These phrases have been interpreted expansively, as "voting" under the Voting Rights Act that "includes 'all action necessary to make a vote effective.'" *Allen*, 393 U.S. at 566. Because the text of Section 11(b) protects against a range of voting-related activity, the courts have found that a plaintiff need only show that the alleged acts to "intimidate, threaten, and coerce" affected an activity sufficiently related to voting to give rise to a Section 11(b) claim.[13] Defendants' plans to send armed

---

[12] *See* Klein Ex. 5 (cover portrait of Atlas Chief Operating Officer Michael Beltran dressed as an armed special operations forces soldier).

[13] *See U.S. by Katzenbach v. Original Knights of Ku Klux Klan,* 250 F. Supp. 330, 353 (E.D. La. 1965) (stating that Section 131(b) "may be extended against interference with any activity having a rational relationship with the federal political process."); *United States v. McLeod*, 385 F.2d 734, 734 (5th Cir. 1967) (voter registration meetings protected by Section 131(b)); *Willingham v. Cnty. of Albany*, 593 F. Supp. 2d 446, 462-64 (N.D.N.Y. 2006) (filling out blank absentee ballots and ballot applications that were collected from eligible voters via questionable methods could give rise to a Section 11(b) claim). So long as there is a sufficient nexus between the alleged intimidation and a voting-related activity, Section 11(b) applies. *See also United States v. Robinson*, 813 F.3d 251, 259 (6th Cir. 2016) ("That [the victim] had desired to vote for [a different mayoral candidate] but did not leave his house . . . because of the presence of

guards *to the voting polls* easily meets this standard.[14]

## B.   There is no Intent Requirement Under Section 11(b)

Section 11(b) does not include an intent requirement. Acts that "intimidate, threaten, or coerce" individuals from engaging in voting-related activity, or that "attempt" to do so, violate Section 11(b). Defendants' subjective intent need not be established.

Section 11(b) borrows much of its language from Section 131(b) of the Civil Rights Act of 1957, 52 U.S.C. § 10101(b). Unlike Section 131(b), however, Section 11(b) does not require that the intimidation, threats, or coercion be "for the purpose of interfering with" the right to vote. The omission of this "for the purpose of" language

---

[defendants] . . . amounted to intentional intimidation and oppression of voting rights." (interpreting analogous federal statute at 18 U.S.C. § 241)).

[14] Order, Dkt. at 2, *Daschle v. Thune*, No. 04 Civ. 04177 (D.S.D. Nov. 1, 2004) (granting a temporary restraining order under Section 11(b) enjoining individuals associated with a Republican campaign from "following Native Americans from the polling places and directing that they not copy the license plates of Native Americans driving to the polling places," after those individuals had followed Native American voters to their polling places, stood closely behind the voters, and engaged in loud conversations about Native Americans prosecuted for voting illegally); *United States v. Bruce*, 353 F.2d 474, 476 (5th Cir. 1965) (Black insurance collector Lonnie Brown was protected from economic intimidation under Section 11(b)'s predecessor statute based on his efforts to help register voters because coercive acts that "put an end to [Mr. Brown's] activities in the field of voter registration" violated Section 131(b), Section 11(b)'s predecessor statute); *McLeod*, 385 F.2d at 738-39 (applying Section 131(b) and holding that Selma police officers had engaged in intimidating activity in interference with the right to vote when they (1) surveilled voter registration meetings; (2) arrested individuals in attendance at those meetings under other pretexts; and (3) arrested individuals engaged in "large scale demonstrations relating to voter registration").

demonstrated a clear congressional intent to remove any intent requirement from Section 11(b).

The legislative history confirms Congress's intent. The House Report on the Voting Rights Act explains: "[U]nlike [Section 131(b)] (which requires proof of a 'purpose' to interfere with the right to vote) no subjective purpose or intent need be shown." H.R. Rep. No. 89-439, at 2462 (1965). Conduct that has the "inevitable effect" of discouraging, intimidating, threatening, or coercing people seeking to exercise their right to vote is prohibited. *Clark*, 249 F. Supp. at 728; *see also, e.g.*, *Daschle v. Thune*, ECF No. 6, No. 4:04-cv-04177 (LLP) (D.S.D. Nov. 1, 2004) (granting temporary restraining order under Section 11(b) enjoining individuals from "following Native Americans from the polling places" and making loud remarks about illegal voting by Native Americans; noting that "[w]hether the intimidation was intended or simply the result of excessive zeal is not the issue, as the result was the intimidation of prospective Native American voters in [that county].").

While the facts presented here make the inference compelling that Defendants' intent is to intimidate voters, under Section 11(b), an injunction should issue regardless of the subjective intent behind Defendants' campaign.

## II.      PLAINTIFFS FACE IRREPARABLE HARM

Plaintiffs will be irreparably harmed absent preliminary relief. "[B]ecause the potential abridgment of Plaintiffs' constitutional rights stems from its effect on voting and associational rights in connection with an election, it is certainly irreparable in the sense that it cannot be adequately compensated post-election." *Pavek v. Simon*, No. 19

Civ. 3000 (SRN/DTS), 2020 WL 3183249, at *21 (D. Minn. June 15, 2020) (holding that plaintiffs challenging a ballot statute would suffer irreparable harm even though the election was still months away).

"Courts routinely recognize that restrictions on voting rights constitute irreparable injury." *Craig v. Simon*, No. 20 Civ. 2066 (WMW/TNL), 2020 WL 5988497, at *8 (D. Minn. Oct. 9, 2020) (citing *League of Women Voters of N.C. v. N. Carolina*, 769 F.3d 224, 247 (4th Cir. 2014)); *Flores v. Town of Islip*, 382 F. Supp. 3d 197, 228 (E.D.N.Y. 2019) (collecting cases) (holding that "that there would be irreparable harm if the upcoming elections were permitted to proceed under a framework that violated the VRA."); *United States v. Berks Cnty., Pa,*, 250 F. Supp. 2d 525, 540 (E.D. Pa. 2003) (collecting cases) ("[T]he holding of an upcoming election in a manner that will violate the Voting Rights Act constitutes irreparable harm to voters."). Courts have repeatedly made clear that plaintiffs "would certainly suffer irreparable harm if their right to vote were impinged upon." *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986) ("A restriction on the fundamental right to vote . . . constitutes irreparable injury."). *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (citing *Williams*, 729 F.2d at 326). Indeed, individuals deprived of the right to vote in violation of the VRA have no post-deprivation remedy to redress the violation. *See Casarez v. Val Verde Cnty.*, 957 F. Supp. 847, 864–65 (W.D.Tex.1997) (granting preliminary injunction because monetary damages could not redress Voting Rights Act violation); *see also Democratic Nat'l Comm. v. Bostelmann*, 447 F. Supp. 3d 757, 770 (W.D. Wis. 2020) (citing *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006)) ("[T]raditional legal remedies

18

would be inadequate, since infringement on a citizen's constitutional right to vote cannot be redressed by money damages."). For this reason, courts often grant preliminary injunctions and temporary restraining orders against voter intimidation prohibited under Section 11(b). *See, e.g., Ariz. Democratic Party v. Ariz. Republican Party*, No. 16 Civ. 03752 (PHX/JJT), 2016 WL 8669978 (D. Ariz. Nov. 4, 2016); *Daschle*, *supra*; *see also Joyner v. Browning*, 30 F. Supp. 512 (W.D. Tenn. 1939) (pre-VRA case enjoining planned deployment of armed troops on election day).

Here, there is irreparable harm because Defendants have directly attempted to intimidate voters and have in fact intimidated voters from voting, and that intimidation is continuing. *See Ariz. Democratic Party*, 2016 WL 8669978, at *11 ("[I]f some potential voters are improperly dissuaded from exercising their franchise, it is unlikely those voters can be identified, their votes cannot be recast, and no amount of traditional remedies such as money damages would suffice after the fact"[O]nce the election occurs, there can be no do-over and no redress." *League of Women Voters of N.C.*,769 F.3d at 247 (holding that discriminatory voting procedures that violate the Voting Rights Act are serious violations for which the courts have granted immediate relief). Because early voting has begun and Election Day is just two weeks away, a temporary restraining order and preliminary injunction enjoining Defendants from continuing to engage in intimidating, threatening, and coercive acts is necessary to avoid the irreparable loss of voters' fundamental rights.

Plaintiffs CAIR-Minnesota and LWVMN will also suffer irreparable harm in the form of diverted resources. CAIR-Minnesota and LWVMN will have to continue to

divert resources from their core activities to take new and unprecedented steps to address

Defendants' threats and the fear among voters, including reaching out to administrative

officials and law enforcement on behalf of their members, educating voters on absentee

voting, addressing voter concerns over Defendants' plans, and gathering information on

Defendants' plans to pass on to voters. Absent the Atlas campaign, CAIR-Minnesota and

LWVMN would be spending their resources on their ordinary voter education and

enfranchisement efforts. *See* Hussein Decl. ¶ 20, Witte Decl. ¶¶ 7, 11-13.

This diversion of resources is already happening and will only increase absent

injunctive relief. CAIR-Minnesota has made public and private requests of local law

enforcement and the state Attorney General to investigate voter suppression. *See* Hussein

Decl. ¶¶ 12, 19. A community safety meeting is being coordinated with local police

chiefs and community leaders where the Atlas campaign and other voter suppression and

community wide safety issues will be addressed. *Id.* ¶ 19. Similarly, LWVMN's staff—

both at the head office and at their thirty-five local Leagues—have spent time speaking

with LWVMN members to allay their fears from the threat of armed guards at polling

stations. *See* Witte Decl. ¶ 12. LWVMN has been speaking and strategizing with partners

in the voting rights advocacy community about the same issue, and spending time

researching the laws that would restrict Atlas's ex-soldiers from interfering with their

members ability to vote. *Id.*

The resources that CAIR-Minnesota and LWVMN are expending to address the

Defendants' intimidation campaign cannot be recovered at a later date. "Irreparable harm

occurs when a party has no adequate remedy at law, typically because its injuries cannot

be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). Because Section 11(b) does not allow for damages, the harm that Plaintiffs face in the absence of a preliminary injunction will be irreparable. Moreover, voting is happening now and the election concludes in a matter of weeks—the diversion of resources during this critical period cannot be repaired.

## III.   THE EQUITIES AND PUBLIC INTEREST FAVOR INJUNCTIVE RELIEF

A balance of harms and consideration of the public interest both weigh in favor of an injunction to maintain the status quo and prevent armed guards from descending on Minnesota's poles. "Balancing the harms involves assessing the harm the movant would suffer absent an injunction, as well as the harm other interested parties would experience if the injunction issued *Pavek,* 2020 WL 3183249, at *27 (citations omitted). "It requires the Court to flexibly weigh the case's particular circumstances to determine whether ... justice requires the court to intervene to preserve the status quo." *Id*. ((internal quotation marks and citations omitted). Courts must also "consider the interest[s] of the public when deciding whether a preliminary injunction should issue." *Id*.

Plaintiffs and the public face significant hardship if an injunction is not issued. "Voters have an unparalleled interest in the fair, impartial administration of elections, free from improper restraints or constrictions on the cherished right to vote." *Craig*, 2020 WL 5988497, at *9 (internal citations omitted). "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the

right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). The Supreme

Court has held that "voting is of the most fundamental significance under

our constitutional structure." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (quotation

marks and citations omitted). Because the right to vote is "preservative of other basic

civil and political rights, any alleged infringement of the right of citizens to vote must be

carefully and meticulously scrutinized." *Reynolds v. Sims*, 377 U.S. 533, 562 (1964). The

public interest "favors permitting as many qualified voters to vote as possible." *Obama

for Am.*, 697 F.3d at 437.  The Supreme Court has recognized that states have "a

compelling interest in protecting voters from confusion and undue influence." *Burson v.

Freeman*, 504 U.S. 191, 199 (1992).

The public interest in favor of an injunction is particularly strong here because the

right to vote freely is "the essence of a democratic society." *Reynolds,* 377 U.S. at 555. It

is clear that the public has a strong interest in all eligible voters being able to vote,

because "it is always in the public interest to protect constitutional rights." *Phelps-Roper

v. Nixon*, 509 F.3d 480, 485 (8th Cir. 2007), *modified on reh'g*, 545 F.3d 685 (8th Cir.

2008); *see also Iowa Right to Life Comm., Inc. v. Williams*, 187 F.3d 963, 970 (8th Cir.

1999) ("[T]he public interest favors protecting core First Amendment freedoms."). In

addition, "courts of equity may go to greater lengths to give 'relief in furtherance of the

public interest than they are accustomed to go when only private interests are involved.'"

*E. Tenn. Nat. Gas Co. v. Sage*, 361 F.3d 808, 826 (4th Cir. 2004) (quoting *Virginian Ry.

Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 552 (1937)); *see also Gallagher v. N.Y. State Bd.

of Elections*, No. 20 Civ. 5504 (AT), 2020 WL 4496849, at *21 (S.D.N.Y. Aug. 3, 2020)

22

(enjoining New York State Board of Elections to tally mail-in ballots that were improperly invalidated after recognizing the substantial burden to plaintiffs "fac[ing] disenfranchisement through no fault of their own.").

At the same time, Defendants face *no* legally protectable burden from the proposed injunction, which seeks only to enjoin their illegal activity. Defendants' advertisement states that they have been retained to provide a host of security functions, not limited to sending armed guards to the polls—those functions can continue. Exs. 3-4. Plaintiffs' requested injunction is narrowly tailored to prevent Defendants from violating the law by making statements that have an intimidating impact on voters, and to assure voters that Defendants will not illegally deploy armed elite former military personnel or otherwise intimidate or harass voters at polling locations during in-person early voting and on Election Day itself. Plaintiffs' motion should be granted.

Enjoining Defendants from engaging in conduct that Congress specifically barred and has no public benefit is crucial to restoring the Minnesotan's trust that they can vote in-person without intimidation, and it is an appropriate use of the Court's injunctive powers.

## IV.    DEFENDANTS SHOULD IDENTIFY JOHN DOES #1-10

Plaintiffs request that the Court order Defendants Atlas and Caudle to immediately identify the local security firm that is partnering with them to deploy armed guards (John Doe #1) and the and the businesses, entities, or individuals who hired them to send armed guards to the polls (John Does #2-10). This narrow, crucial discovery is necessary for Plaintiffs to identify and serve all Defendants, prepare for the requested preliminary

23

injunction hearing, and ensure the injunctive relief is appropriately tailored. Because in-person voting is already underway in Minnesota, this discovery will serve the public interest, prevent Plaintiffs from suffering further irreparable harm from anonymous and unaccountable actors, and ensure compliance with the requested injunction. Moreover, Defendants' own statements to the media make clear that they are working with "a locally licensed firm in Minnesota" as the as the prime contractor in the effort to deploy armed former soldiers to Minnesota polling locations (i.e. John Doe #1), Exs. 3-4. Defendants also stated that they were hired by a "consortium of business owners and concerned citizens" (i.e. John Does #2-10). *See* Ex. 2. Identifying the security firm Defendants admitted they are working with and the clients Defendants admitted retained them imposes no meaningful burden on Atlas and Caudle.

Courts in this Circuit routinely order such expedited discovery upon granting temporary restraining orders. *See Benefits Admin. Comm. of Brush Aftermarket N. Am., Inc. Grp. Pension Plan v. Wencl*, No. 16-CV-2794 (WMW/BRT), 2016 WL 8809478, at *4 (D. Minn. Aug. 22, 2016) (granting expedited discovery for the "purpose of appropriately tailoring the scope of the TRO and preliminary injunction as necessary to protect Plaintiff's interests"); *Bonus of Am., Inc. v. Angel Falls Servs., L.L.C.*, No. CIV.10-2111(DSD/FLN), 2010 WL 2218574, at *4 (D. Minn. May 28, 2010) (granting expedited discovery to prepare for a motion for a preliminary injunction); *Meritain Health Inc. v. Express Scripts, Inc.*, No. 4:12-CV-266 CEJ, 2012 WL 1320147, at *2 (E.D. Mo. Apr. 17, 2012) (noting that "[e]xpedited discovery is generally appropriate in cases, such as this, where a party is attempting to prepare for a preliminary injunction

24

hearing" and permitting parties to engage in depositions and document production prior to preliminary injunction hearing).

## V.   WAIVER OF THE BOND REQUIREMENT IS APPROPRIATE

Rule 65 requires that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper" but "the amount of the bond rests within the sound discretion of the trial court and will not be disturbed on appeal in the absence of an abuse of that discretion." *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Engineers*, 826 F.3d 1030, 1043 (8th Cir. 2016) (alteration in original) (quotation marks and citations omitted). This Court has discretion to "waive the bond requirement based on its evaluation of public interest in this specific case." *Id.* (upholding district court's waiver of bond requirement); *Pashby v. Delia*, 709 F.3d 307, 331–32 (4th Cir. 2013) ("the district court retains the discretion to set the bond amount as it sees fit or waive the security requirement"). In addition, numerous courts have held that where, as here, Plaintiffs have demonstrated a high likelihood of success on the merits, a bond is not necessary. *Bixby v. Lifespace Communities, Inc.*, No. 18 Civ. 817 (JRT/KMM), 2018 WL 3218697, at *7 (D. Minn. July 2, 2018) (finding that "a bond is not necessary in this case because Plaintiffs have demonstrated a high likelihood of success on the merits"); *Perfetti Van Melle USA, Inc. v. Midwest Processing, LLC*, 135 F. Supp. 3d 1015, 1021 (D.S.D. 2015) (finding that there was "little risk" to Defendants in proceeding without a bond because of Plaintiff's likelihood of success).

In light of the importance of the right to be vindicated and the fact that Plaintiffs are not-for-profit public interest entities, Plaintiff respectfully requests that the Court waive Rule 65's security requirement in this matter.

## CONCLUSION

For the foregoing reasons, the Court should enter the proposed temporary restraining order and preliminary injunction enjoining Defendants from sending armed ex-soldiers to Minnesota's polling sites while polling is underway, from recruiting armed agents for the purpose of sending those agents to or near polling locations while polling is underway, or from engaging in other actions that may intimidate voters or interfere with voter access to polling locations while voting or the counting of votes is underway, at any time prior to and during the general election on November 3, 2020 or the counting of the voters for electors thereafter.

Date: October 20, 2020

Respectfully submitted,

s/Julia Dayton Klein
**LATHROP GPM LLP**
Julia Dayton Klein (MN Bar #0319181)
Amy Erickson (MN Bar #0399214)
500 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Julia.DaytonKlein@lathropgpm.com
Amy.Erickson@lathropgpm.com
(612) 632-3153
(612) 632-3470

**EMERY CELLI BRINCKERHOFF
ABADY WARD & MAAZEL LLP**
Jonathan S. Abady*
Mathew D. Brinckerhoff*
O. Andrew F. Wilson*

26

Debra L. Greenberger*
Vivake Prasad*
600 Fifth Avenue, 10th Floor
New York, NY 10020
Tel: 212-763-5000
jabady@ecbawm.com
mbrinckerhoff@ecbawm.com
awilson@ecbawm.com
dgreenberger@ecbawm.com

**FREE SPEECH FOR PEOPLE**
Ronald Fein*
John Bonifaz*
Ben Clements*
1320 Centre Street, Suite 405
Newton, MA 02459
Telephone: (617) 244-0234
jbonifaz@freespeechforpeople.org
rfein@freespeechforpeople.org
bclements@freespeechforpeople.org

**ATTORNEYS FOR PLAINTIFFS**

*Motions for admission *pro hac vice*
forthcoming