IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| Council on American-Islamic Relations – Minnesota and League of Women Voters of Minnesota, | Court File No.: 20-cv-02195 (NEB-BRT) |
| Plaintiffs, | **PROPOSED MEMORANDUM OF LAW OF *AMICUS CURIAE* CITY OF SAINT PAUL IN SUPPORT OF PLAINTIFFS** |
| v. | |
| Atlas Aegis, LLC, Anthony Caudle, and John Does #1-10, | |
| Defendants. | |

The City of Saint Paul, Minnesota (the "City," or "Saint Paul") respectfully submits this proposed memorandum of law as *amicus curiae* in support of Plaintiffs. Saint Paul has met and conferred with Plaintiffs regarding this filing, and they support it.

## INTRODUCTION

It is all but certain that, although Defendants have yet to specify precisely *where* they intend to "secure" Minnesota's polling places, their armed security personnel will be deployed in Saint Paul, Minnesota's second-largest city and the site of many of the public protests since the death of George Floyd.[1] Saint Paul does not welcome, and joins Plaintiffs in opposing, Defendants' unwarranted and unlawful efforts at "securing" the City's polling

---

[1] The fact that Defendants intend to "secure" Saint Paul polling places is reinforced by their advertisement seeking personnel to work as "ARMED SECURITY" for :NOVEMBER ELECTIONS and POST ELECTION SUPPORT MISSIONS" in the "Minneapolis/St. Paul, MN" area. *See* Complaint, § 15.

places. It is imperative that the Court act to prevent these activities by granting the injunctive relief requested by Plaintiffs.

As Plaintiffs argue in their own Memorandum of Law, Defendants will, unless enjoined by the Court from doing so, wrongfully deter Minnesota residents, particularly but not limited to foreign-born and first-generation American voters and voters of color, from the full and fair exercise of their fundamental and essential right to vote, through deliberate and unjustified intimidation at the polls. The City joins this matter as *amicus curiae* because the harm caused by Defendants' conduct will be irreparable, and particularly severe and pernicious with respect to City residents.

Defendants' stated goal of "protecting" the State's polls through the presence of armed paramilitary personnel will have a significant deterrent effect on Saint Paul voters and will, in effect, lead to voter suppression. Saint Paul residents will, if Defendants are permitted to "secure" City polling places, be under-represented at the polls, reducing the City's weight in voting in statewide elections and negatively impacting resident input in city matters at the local level. This effect will be even greater for Saint Paul's disproportionally high number of residents of color and immigrants, given Defendants' avowed goal of "protecting" the polls from supporters of the Black Lives Matter movement. This harm is especially egregious given that it will fall on groups who have historically been disenfranchised and under-represented in elected office.

In addition, Defendants' planned "security" efforts violate Minnesota state law, and are likely to instigate, not defuse, confrontations at polling places, at a time when tensions

within our community already run high. This will in turn lead to an unnecessary drain on City law enforcement resources which can and properly should be utilized elsewhere.

The Court should grant Plaintiffs' motion for temporary injunctive relief, and bar Defendants from taking any action whatsoever which might deter citizens from the free exercise of their fundamental voting rights.

## BACKGROUND FACTS

I. **Demographics of the City of Saint Paul.**

The City of Saint Paul is the second-largest city in Minnesota by population.[2] Although smaller than Minneapolis, Saint Paul has nearly three times the population of the third-largest city in the state, Rochester. *Id.*

Saint Paul is considerably more racially diverse than the state as a whole. 16.0% of Saint Paul's population is Black, as compared to 6.8% of the state's population. *Id. See* Declaration of Anthony G. Edwards in Support of Memorandum of law of *Amicus Curiae* City of Saint Paul ("Edwards Decl."), ¶ 2.a; Ex. A. Saint Paul also has a greater percentage of immigrants than the state of Minnesota. *Id.* 19.7% of Saint Paul's residents are foreign-born, as compared to 8.4% of the population of the State as a whole. *Id.*

II. **Black Lives Matter Protests in Saint Paul.**

Since the death of George Floyd in May 2020, the Twin Cities, and Saint Paul in particular, have been the epicenter of significant public protests, including protests

---

[2] *See* information promulgated by the Minnesota Department of Administration – State Demographic Center, at https://mn.gov/admin/demography/data-by-topic/population-data/our-estimates/.

conducted in the name of Black Lives Matter. Edwards Decl., § 2.b; Ex. B. This has continued to the present day, including protests in September of this year following the announcement that no homicide charges would be brought in connection with the death of Breonna Taylor. Edwards Decl., ¶ 2.c; Ex. C. According to Saint Paul Police Department records, at least 179 incidents of protest have occurred between June 2 and October 21, 2020. Edwards Decl., ¶ 3. While the great majority of protests have been peaceful, Saint Paul has also seen civil unrest including the destruction of property. Edwards Decl., ¶ 2.d; Ex. D.

The Black Lives Matter movement enjoys broad popular support in the Twin Cities. According to a September 2020 poll, the majority of residents of Hennepin and Ramsey County indicated they support the movement. Edwards Decl., ¶ 2.e; Ex. E.

## ARGUMENT

"The political franchise of voting . . . is regarded as a fundamental right, because preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886); *see also McLain v. Meier*, 637 F.2d 1159, 1163 (8th Cir. 1980) (*citing Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979)) ("'voting is of the most fundamental significance under our constitutional structure' and requires jealous protection").

As Plaintiffs have argued in their Memorandum of Law, Defendants' planned actions in "securing" Minnesota polling places represent a clear violation of Section 11(b) of the Voting Rights Act of 1965, at 52 U.S.C. § 10307(b) (the "VRA"). Saint Paul adopts and joins in Plaintiffs' arguments. In addition, Saint Paul offers the following arguments, specific to the interests of the City's residents and Saint Paul as a whole.

I.  **Defendants' Conduct in Violation of the Voting Rights Act of 1965 Will Unjustifiably Hinder Fair Voting in Saint Paul.**

Defendant Anthony Caudle has stated that Defendants' planned "security" efforts at polling places are intended to "protect" the polls from "antifa" and Black Lives Matter supporters:

> "Unfortunately back when the first antifa and Black Lives Matter protests were happening, the entire country was left completely unprepared," [Caudle] said. "So we're just going to do our absolute A-number-one best to make sure that that doesn't happen this time around."

Declaration of Julia Dayton Klein ("Klein Decl."), ¶ 2.b; Ex. 2.  It is not clear precisely how Defendants intend to "protect" the polls, but their planned "security" measures undisputedly include the presence of armed paramilitary members at polling places, on the lookout for, among others, supporters of the Black Lives Matter movement.  *Id.*

Saint Paul has seen considerable protests since the death of George Floyd, often by supporters of the Black Lives Matter movement.  Edwards Decl., ¶¶ 2.b-d; Exs. B-D.  It is, accordingly, a veritable certainty that Saint Paul, Minnesota's second-largest city, will be a primary focus for Defendants' paramilitary "poll security" efforts.

As Plaintiffs have argued, Defendants' planned "security" efforts represent rank voter intimidation, in violation of the VRA. Regardless of Defendants' intentions (which, as Plaintiffs observe, need not be established in order to grant the requested injunctive relief), these efforts will certainly deter some voters, particularly law-abiding supporters of the Black Lives Matter movement (a movement supported by most residents of the Twin Cities), people of color, and immigrants.  These groups will justifiably fear that the peaceful exercise of their essential right to vote might devolve into a violent confrontation with

Defendants' armed "security" personnel. This may cause some voters to arrive at the polls, but, upon seeing Defendants' paramilitary force, elect not to cast a vote. It may mean some are too afraid to go to the polls at all.

Defendants' efforts at voter intimidation will work a particular harm to Saint Paul, whose residents are considerably more likely than non-Metro Area residents to be Black, foreign-born, and/or supporters of Black Lives Matter. Saint Paul voters will (as compared to voters in smaller, predominantly White communities, or unincorporated areas) be disproportionally likely to refrain from voting out of justified fear of the armed personnel "securing" their polling places. The net effect will be that City residents are proportionally underrepresented in voting in statewide elections, such as those for President and Senate. In addition, communities of color, immigrant communities and Black Lives Matter supporters will have a reduced impact on local elections, as compared to others who are not deterred from voting by the presence of Defendants' paramilitary force. These elections include races for State Senator, State Representative, school board, and judicial elections. These positions continue to under-represent the very communities likeliest to be deterred by Defendants' "security" operations.

Simply put, regardless of Defendants' intent, the mere presence of an armed paramilitary force will suppress categories of voters through fear. The net effect of Defendants' "security" efforts would be an unjust, unwarranted interference with Saint Paul residents' free exercise of their sacrosanct right to vote, in direct violation of the City's established interest in encouraging all of its residents, from many different communities and with differing political beliefs, to participate in elections free from interference and

intimidation. Defendants can identify no real-world threat to the security of Minnesota elections which would justify their voter intimidation and the resulting, foreseeable suppression of some votes. In the midst of the global COVID-19 pandemic, the voters of Saint Paul cannot, and should not be required to, abide another unnecessary burden on their ability to cast their votes. The City categorically opposes Defendants' presence at its polling places.

II. **Defendants' Planned Paramilitary Presence Would Violate Minnesota State Laws Intended to Protect the Voting Process, and Lead to an Unwarranted Drain on Law Enforcement Resources.**

    A. <u>Defendants' Actions Would Violate State Laws, Many of Which Are Enforced at the City Level.</u>

Elections in Minnesota are governed by state and federal laws, but the actual operation of polling places is handled by local governments, including cities and counties. In addition to the federal laws referenced in the Complaint and Plaintiffs' Memorandum, Minnesota's state laws include numerous provisions intended to preclude intimidation and interference with voting rights.

Minnesota Statutes section 204C.06 prohibits unlawful interference with voting and specifically prohibits individuals, other than election officials and voters, from standing within 100 feet of the building in which a polling place is located. Minn. Stat. § 204C.06, subd. 1;[3] Similarly, Minnesota election law prohibits any person from:

---

[3] Section 204C.06, subd. 1 states that:
    An individual shall be allowed to go to and from the polling place for the purpose of voting without unlawful interference. No one except an election official or an

> threatening force, coercion, violence, restraint… against an individual to compel the individual to vote for or against a candidate…[and]… Abduction, duress, or fraud may not be used to obstruct or prevent the free exercise of the right to vote of a voter….

Minn. Stat. § 211B.07.

Minnesota law specifically prohibits the presence of law enforcement, including city police officers, within 50 feet of a polling place except under certain circumstances:

> Except when summoned by an election judge to restore the peace or when voting or registering to vote, no peace officer shall enter or remain in a polling place or stand within 50 feet of the entrance of a polling place.

Minn. Stat. § 204C.06, subd. 6. Section 204C.06, subd. 6 works hand-in-hand with Minnesota's Sergeant-at-Arms provision, at Minnesota Statutes section 204C.06, subd. 5, which permits election judges, and <u>only</u> election judges, to appoint a sergeant-at-arms "when necessary to keep the peace or otherwise to help them," and to request a sergeant-at-arms or peace officer to arrest or remove anyone who engages in disorderly conduct. No similar provision of law exists which permits third parties like Defendants to provide "security officers" to "assist" with election security.

In summary, Minnesota's state election laws are designed to encourage voting without intimidation and restrict the presence of law enforcement personnel, let alone

---

individual who is waiting to register or to vote or an individual who is conducting exit polling shall stand within 100 feet of the building in which a polling place is located. "Exit polling" is defined as approaching voters in a predetermined pattern as they leave the polling place after they have voted and asking voters to fill out an anonymous, written questionnaire.

armed paramilitary forces purporting to "secure" polling places. These restrictions are imposed consistent with the United States Supreme Court's holding that:

> A polling place in Minnesota qualifies as a nonpublic forum. It is, at least on Election Day, government-controlled property set aside for the sole purpose of voting. The space is "a special enclave, subject to greater restriction." Rules strictly govern who may be present, for what purpose, and for how long.

*Minnesota Voters All. v. Mansky*, 138 S. Ct. 1876, 1886, 201 L. Ed. 2d 201 (2018) (quoting *Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 680, 112 S. Ct. 2701, 2706, 120 L. Ed. 2d 541 (1992).

In addition to and separate from state election laws, Defendants' deployment of an armed "security" force would violate provisions of the Minnesota Constitution and Minnesota Statutes which make it illegal to operate an unauthorized private militia. *See* Minn. Const. Art 1, Sec. 14 ("[t]he military shall be subordinate to the civil power and no standing army shall be maintained in this state in times of peace") and Minn. Stat. § 624.61 ("It shall not be lawful for any body of persons, other than the National Guard [or] troops of the United States… to associate themselves together as a military company with arms"). The Second Amendment does not supersede these state-law prohibitions on private militias. *District of Columbia v. Heller*, 554 U.S. 570, 621 (2008) (citing *Presser v. Illinois*, 116 U.S. 252 (1886)) (holding that the Second Amendment "does not prevent the prohibition of private paramilitary organizations"). The Defendants' planned activities would also represent unlawful interference with the use of public property in violation of Minnesota Statutes section 624.72, subd. 5.

Further, many Saint Paul polling places are located on school property. Edwards Decl, ¶ 2.g; Ex. G (identifying Saint Paul polling places, including numerous schools). Under Minnesota law, it is a misdemeanor for individuals to carry a firearm, on or about their clothes or person (even if they have a permit to carry), on school property. Minn. Stat. § 609.66, subd. 1d(d) (2020). The reason for this law is to protect children and school employees, who will most assuredly be present during voting on Election Day.

Defendants' planned activities will violate above-referenced laws, necessitating enforcement action by the City. There is no reasoned justification for allowing Defendants' unlawful activities to proceed despite their clear illegality.

### B. Defendants' Planned Deployment of an Armed Private Security Force Near Polling Places Would Needlessly Consume City Resources.

The law enforcement resources of the City of St. Paul, like other state and local governments, are significantly strained at this time, given the on-going COVID-19 pandemic, the spike in violent crime which has accompanied it (*see* Edwards Decl., ¶ 2.g; Ex. G), and the significant civil unrest that has occurred this year. Tensions are running high, and citizens are justifiably concerned about many issues surrounding voting and the upcoming election. Defendants have stated an intention to employ and send a "large contingent" of armed former soldiers to Minnesota. They have said that the armed, highly trained agents would act "when there is an issue" and are targeting people with specific political beliefs such as supporters of the Black Lives Matter movement. (Complaint, §§ 25-27.)

If the City is forced to respond to calls and inquiries about Defendants' armed personnel at numerous polling sites throughout the City (as will inevitably occur given the novelty and illegality of armed "security" officers at Minnesota polling places), the result will be a significant, unjustified drain on City police forces and resources which could be otherwise spent responding to other important public safety calls within the City.

The presence of armed private "security" at polling places or other areas is illegal under Minnesota law, and unsupported by any rational justification which could balance allowing them in light of their foreseeably suppressive effect on voters' rights. The City of St. Paul fully supports Plaintiffs' request for injunctive relief.

## CONCLUSION

For the above-stated reasons, the City hereby respectfully requests that the Court grant the Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, and grant all relief requested thereunder.

Respectfully submitted,

Dated: October 22, 2020

LYNDSEY OLSON
City Attorney

 s/Anthony G. Edwards
ANTHONY G. EDWARDS, #342555
MEGAN D. HAFNER, #293751
Assistant City Attorneys
*Attorneys for City Defendants*
750 City Hall and Court House
15 West Kellogg Boulevard
Saint Paul, MN 55102
Telephone: (651) 266-8727
Fax: (651) 266-8787
Email: *anthony.edwards@ci.stpaul.mn.us*
         *megan.hafner@ci.stpaul.mn.us*

11