UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| COUNCIL ON AMERICAN-ISLAMIC RELATIONS—MINNESOTA and LEAGUE OF WOMEN VOTERS OF MINNESOTA, | Case No. 20-CV-2195 (NEB/BRT) |
| Plaintiffs, | ORDER ON MOTION FOR PRELIMINARY INJUNCTION |
| v. | |
| ATLAS AEGIS, LLC, ANTHONY CAUDLE, and JOHN DOES #1–10, | |
| Defendants. | |

Plaintiffs Council on American-Islamic Relations—Minnesota and League of Women Voters of Minnesota (collectively, the "Voter Organizations") filed this lawsuit seeking to enjoin Atlas Aegis, LLC, Anthony Caudle ("Defendants"), and unknown John Does #1–10[1] from placing armed agents at polling places in Minnesota for the upcoming general election. The Voter Organizations moved for a temporary restraining order and preliminary injunction. (ECF No. 4.) For the following reasons, the Court grants the motion for preliminary injunction.

---

[1] Johns Does #1-10 have not been identified to this Court or served, and they are not bound by the injunctive relief granted herein.

## BACKGROUND

The Voter Organizations are non-profit civic engagement organizations that work, among other things, to get out the vote. (ECF No. 1 ("Compl.") ¶¶ 8–9.) Atlas Aegis, LLC ("Atlas"), is a private security company that provides security services staffed by paramilitary personnel; Anthony Caudle is its chairman. (*Id.* ¶¶ 10–11.) John Doe 1 is an unknown Minnesota-licensed private security firm that has allegedly contracted with Atlas; John Does 2–10 are several unknown parties, members of a "consortium of business owners and concerned citizens," who hired John Doe 1. (*Id.* ¶¶ 12–13, 20.)

On October 6, 2020, Atlas created a job posting for former special forces personnel to "protect election polls, local businesses and residences from looting and destruction" in Minnesota. (*Id.* ¶¶ 14–23.) After the posting went live, Caudle conducted an interview with journalists where he discussed the posting and stated that he was planning to send a "large contingent" of armed agents to Minnesota, and that their goal would be to prevent "antifa" from destroying election sites. (*Id.* ¶¶ 25–26.) Caudle said that the armed agents would step in if there was "an issue," and that the goal was to prevent a repeat of property damage from protests that occurred in Minneapolis and Saint Paul following the death of George Floyd in May 2020. (*Id.* ¶¶ 27–28.) After publication of Caudle's interview, many Minnesota elected officials and members of the public criticized the plan. (*Id.* ¶¶ 32–36.) Caudle, despite this criticism, refused to change Atlas' plans. The Voter Organizations have since diverted extensive resources to counter the perceived

effects of Defendants' actions. (*Id.* ¶¶ 50–56.) For example, the Minneapolis City Clerk attests that since news of Caudle's interview and Atlas' plans broke: residents have expressed distress about security and harassment at polling places; polling site representatives have expressed concern over security, safety, and possible unrest at polling sites; public officials have sought information on the plans for polling site security; and two election judges have withdrawn due to concerns for their safety. (ECF No. 32 ¶ 8.) Likewise, the City of Saint Paul has articulated concern that, if Atlas is not enjoined from sending paramilitary personnel to the polls, voters will be intimidated, particularly because Saint Paul has a large population of minority voters who may be especially likely to be intimidated by Atlas' armed agents. (ECF No. 24 at 5–7; ECF No. 25-1 at 1–2.)

After this motion was filed, but before the scheduled hearing, Minnesota Attorney General Keith Ellison entered into an Assurance of Discontinuance (the "Assurance") with Atlas (but not Caudle). (ECF No. 37-1 ("Assurance").) In the Assurance, Atlas stated that it had misunderstood the parameters of the request for security and that no party had sought security for the polls on Election Day. (*Id.* ¶¶ 2–7.) Atlas also admitted that Caudle had spoken incorrectly with the media and stated that its intent was not to intimidate, coerce, or threaten voters. (*Id.* ¶¶ 7–8.) Atlas said that neither it nor any of its officers or employees were engaged to work in Minnesota in November 2020, nor would they be present in Minnesota in November 2020; Atlas also stated that it was unaware of

3

any groups or individuals that planned to provide election "security" at the polls. (*Id.* ¶¶ 9–11.) In the Assurance, Atlas (but not Caudle) agreed: (1) not to provide any protective services, as defined by Minnesota statute, from October 22, 2020, through January 1, 2022; (2) not to seek to intimidate voters in Minnesota or elsewhere; and (3) to clarify its job postings that election security was not part of the work. (*Id.* ¶¶ 13–15.) Atlas also agreed to a stayed $50,000 civil penalty for violations. (*Id.* ¶ 17.) Atlas did not admit to any wrongdoing or violation of any federal or state statute. (*Id.* ¶¶ 19–21.)

The Voter Organizations allege that Defendants' actions have violated and will continue to violate Section 11(b) of the Voting Rights Act of 1965, which prohibits voter intimidation. 52 U.S.C. § 10307(b).

## ANALYSIS

The Voter Organizations ask the Court to enjoin Defendants from: (1) deploying armed agents within 2,500 feet of Minnesota polling places or otherwise monitoring Minnesota polling places during the general election; (2) threatening to do so; and (3) intimidating, threatening, or coercing Minnesota voters. (ECF No. 9 at 2.) The Voter Organizations also seek the disclosure of the identities of the John Doe defendants. (*Id.*)

I.   **Mootness**

At the outset, the Court must determine whether the Assurance in state court moots the request for injunctive relief here. The Court concludes that it does not.

Article III limits the Court's jurisdiction to cases and controversies under the United States Constitution. U.S. Const. art. III, § 2. A case—or a claim for injunctive relief—is moot (and therefore no longer a case or controversy for Article III purposes) when the issues it presents are no longer "live" or when the parties no longer possess a "legally cognizable interest in the outcome." *Teague v. Cooper*, 720 F.3d 973, 976 (8th Cir. 2013) (internal quotation omitted).[2]

A claim for injunctive relief may become moot if challenged conduct permanently ceases. *Comfort Lake Ass'n v. Dresel Contracting, Inc.*, 138 F.3d 351, 354 (8th Cir. 1998). Generally, when there is no "reasonable expectation that the wrong will be repeated," a claim for injunctive relief is moot. *Id.* (internal quotation omitted). Although there is a higher standard when the defendant's own voluntary actions have mooted the controversy, such as when the change in the defendant's actions is prompted by the threat of enforcement, the question is whether there is a "realistic prospect that the violations alleged" will continue to occur notwithstanding the enforcement action. *Id.* at 355; *Mo. Prot. & Advoc. Servs., Inc. v. Carnahan*, 499 F.3d 803, 811 (8th Cir. 2007). "Mere voluntary cessation of a challenged action does not moot a case. Rather, a case becomes moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could

---

[2] The Court notes that mootness applies to both cases as a whole and particular requests for relief. *See Ohio v. U.S. EPA*, 969 F.3d 306, 309 (6th Cir. 2020) (recognizing a distinction between changed circumstances mooting a case and mooting a motion for preliminary injunctive relief). Accordingly, changed circumstances can moot a request for injunctive relief without mooting the whole case.

not reasonably be expected to occur." *Strutton v. Meade*, 668 F.3d 549, 556 (8th Cir. 2012) (internal quotation and citation omitted). In considering the issue of mootness, courts are skeptical of claims of mootness where the defendant "yields in the face of a court order" and argues that the case is moot, but does not admit that the complained-of conduct was unlawful. *Hartnett v. Pa. State Educ. Ass'n*, 963 F.3d 301, 306 (3d Cir. 2020).

Defendants argue that the Assurance moots the request for injunctive relief because of its breadth: it enjoins Defendants from "doing anything that could be potentially viewed as being voter intimidation" and from being physically present in Minnesota until 2022. (ECF No. 35 at 7.) At argument,[3] Defendants asserted that the Assurance bound all Atlas employees, including Caudle,[4] from seeking to intimidate voters in Minnesota or elsewhere. The Voter Organizations, on the other hand, argued that the Assurance does not necessarily bind Caudle, that his statements should be viewed with skepticism, and that he has not publicly disclaimed his earlier comments.

Here, the Court cannot conclude that Defendants have met their burden to demonstrate mootness. One Defendant, Atlas, has agreed to a certain scope of restrained conduct in an agreement with the Minnesota Attorney General. (Assurance ¶¶ 13–15.)

---

[3] Due to the shortened timeline of the case, not all arguments presented were in briefings filed with the Court.

[4] Caudle, in an affidavit filed with the Court, stated that he considered himself bound by the terms of the Assurance. (ECF No. 36 ¶ 2.)

The Assurance does not moot either the controversy before this Court or the Voter Organizations' request for relief.

First, it is instructive to the Court that Atlas and Caudle had an opportunity for voluntary cessation when the public and elected officials criticized their planned conduct, and they chose to instead reaffirm their commitment to sending armed agents to Minnesota polling places. The behavior stopped only when faced with Attorney General action, and without any admission by Atlas that its conduct violated the law. "To be sure, the defendant's reason for changing its behavior is often probative of whether it is likely to change its behavior again." *Hartnett*, 963 F.3d at 306; *see also id.* (discussing the skepticism of courts when the defendant "assures us that the case is moot because the injury will not recur, yet maintains that its conduct was lawful all along").

Second, the Assurance binds only Atlas, not Caudle. (Assurance at 2.) Although Caudle has indicated that he will abide by the Assurance (ECF No. 36 ¶ 2), his affidavit is merely a piece of evidence for the Court to consider—it is not determinative, and must be weighed against Caudle's prior actions and statements.

Third, this case contrasts with most of the decided cases in this area. Many cases mooted in the context of cessation of the alleged unlawful conduct occur because one party no longer possesses an interest in the case's outcome—for example, a student who is no longer in school, *e.g.*, *DeFunis v. Odegaard*, 416 U.S. 312, 316–20 (1974); an inmate who is no longer in prison, *e.g.*, *Spencer v. Kemna*, 523 U.S. 1, 18 (1998); a law that is no

7

longer on the books, *Teague*, 720 F.3d at 976; or a permit that has now been issued. *Miss. River Revival, Inc. v. City of Minneapolis*, 319 F.3d 1013, 1015–16 (8th Cir. 2003). Here, in contrast, the Voter Organizations continue to have a cognizable legal interest in the scope of the injunctive relief. Their concerns, although partially addressed by the Assurance, are not entirely covered by it.

Put another way, the Assurance lacks complete overlap with the requested relief in this Court. The reach of each court's jurisdiction is different, the parties are different, and the language is different. Because it is not clear that the Assurance covers all conduct that the Voter Organizations seek to enjoin, the Court must conclude, based on the record before it, that there remains a reasonable expectation that the wrong may continue. Therefore, the controversy remains live, the Voter Organizations continue to have a cognizable interest in the outcome, and the request for injunctive relief is not moot.

## II.     Preliminary Injunction

A preliminary injunction is an extraordinary remedy that "should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis omitted). In determining whether to issue injunctive relief, the Court applies the familiar *Dataphase* factors: (1) the movant's likelihood of success on the merits; (2) the threat of irreparable harm to the movant absent the injunction; (3) the balance of the harms between issuance and nonissuance of the

injunction; and (4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (*en banc*).

    A.    *Likelihood of Success on the Merits.*

Section 11(b) of the Voting Rights Act prohibits persons from intimidating, threatening, or coercing, or attempting to do so, those voting, attempting to vote, or aiding and encouraging others to vote.[5] 52 U.S.C. § 10307(b). To succeed on the merits of a claim under Section 11(b), a plaintiff must show that voters were intimidated, or that there was an attempt to intimidate voters, and that the defendant intended to intimidate voters.[6] *Olagues v. Russoniello*, 770 F.2d 791, 804 (9th Cir. 1985). To obtain a preliminary injunction, then, the Voter Organizations must show that it is likely that the Defendants will attempt to intimidate voters or that their actions will do so, and that they likely have the intent to do so.

---

[5] The Voter Organizations have shown—at this stage—standing to bring this action, as they have been forced to divert resources form their primary missions in an effort to counter the Defendants' actions. (ECF No. 7 ¶¶ 19–21; ECF No. 8 ¶¶ 11–14); *Pavek v. Simon*, No. 19-CV-3000 (SRN/DTS), 2020 WL 3183249, at *10 (D. Minn. June 15, 2020). Further, the Voter Organizations have shown—at this stage—standing on behalf of their members because their missions include efforts to increase voting and civic engagement. *Red River Freethinkers v. City of Fargo*, 679 F.3d 1015, 1022, 1027 (8th Cir. 2012); (ECF No. 8 ¶¶ 2–7, 13–14.)

[6] The Voter Organizations dispute the existence of an intent requirement. (ECF No. 5 at 16–17.) The Court need not determine this conclusively, because the Voter Organizations have shown sufficient evidence of subjective intent for purposes of issuing a preliminary injunction.

The Voter Organizations have shown both. Caudle told the press that the personnel were to protect the polls from "antifa," an organization with a known political orientation, and that they were to prevent a repeat of the "antifa and Black Lives Matter protests" that occurred in the wake of George Floyd's death. (ECF No. 6-2 at 2–4.) The presence of armed "guards" at the polls with no connection to state government is certainly likely to intimidate voters. The record reflects that Minnesota residents have already expressed substantial concerns about voting in person on Election Day, Minnesota elected officials have requested information about these activities, and Minneapolis has lost election judges as a result of Defendants' conduct. (ECF No. 32 ¶ 8.) Saint Paul, too, has expressed serious concerns over the actions of Defendants leading to voter intimidation. (ECF No. 24 at 5–7.)

As to subjective intent, Atlas' executive vice president has acknowledged the threatening presence of its personnel, stating that "armed uniform security personnel will always look menacing." (Compl. ¶ 31.) This potential effect is particularly concerning if the armed agents give themselves discretion to step in when, in their subjective view, "there is an issue." (*Id.* ¶ 27.) And, as Caudle has admitted, the goal of this exercise is to prevent a repeat of what happened in Minneapolis and Saint Paul when groups of a certain ideology protested—implying that the aim is at a particular group or groups of individuals.

The Voter Organizations have shown a likelihood of success on the merits.

**B.**     *Irreparable Injury*

The Voter Organizations have demonstrated that they will suffer irreparable injury in the absence of injunctive relief. An injury to the right to vote is an irreparable one because "once the election occurs, there can be no do-over and no redress." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014). Defendants do not contest this point. As organizations that have established standing on behalf of their members because their members may be intimidated (and their right to vote consequently injured), the Voter Organizations have established irreparable injury as well.

**C.**     *The Public Interest and Balance of the Harms*

The balance of harms and public interest in this case favor issuing a preliminary injunction. In balancing the harms, the Court assesses the harm the movant would suffer absent the injunctive relief, as well as the harm other interested parties would suffer if it issues. *Pottgen v. Mo. State High Sch. Activities Ass'n*, 40 F.3d 926, 928 (8th Cir. 1994). The Voter Organizations, as noted above, will suffer continued harm by having to divert resources to counter the perceived effects of the actions of the Defendants. Voters have a strong interest in remaining free from intimidation and in the fair and impartial administration of elections. *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016); *Craig v. Simon*, No. 20-CV-2066 (WMW/TNL), 2020 WL 5988497, at *9 (D. Minn. Oct. 9, 2020). The public, too, has a strong interest in the free and fair conduct of elections,

11

because the right to vote is fundamental to the constitutional structure of the nation. *Burdick v. Takushi*, 504 U.S. 428, 433 (1992). Conversely, although Defendants have an interest in conducting their business as contracted, there can be no legally-protectable interest in intimidating voters, as the Voting Rights Act makes such conduct unlawful. 52 U.S.C. § 10307(b). Accordingly, the public interest and balance of harms weigh in favor of injunctive relief.

After weighing the *Dataphase* factors, the Court concludes that issuance of a preliminary injunction is merited because the Voter Organizations have established a likelihood that they will succeed on the merits of their claims, will suffer irreparable injury in the absence of injunctive relief, and that the balance of harms and public interest weigh in favor of an injunction.

### III.    Bond Requirement

Rule 65(c) permits the Court to issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). In setting security, however, the amount "rests within the sound discretion of the trial court." *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs.*, 826 F.3d 1030, 1043 (8th Cir. 2016). If the public interest favors it, the Court may waive the bond requirement. *Id.* The Court here imposes a bond of $5,000.

### IV.  John Doe Defendants

The Court treats the Voter Organizations' request for disclosure of the identities of John Does #1–10 as a request for expedited discovery. In considering a motion for expedited discovery, courts apply one of two standards: either a "good cause" standard, or one similar to that of a preliminary injunction. *E.g., Meritain Health, Inc. v. Express Scripts, Inc.*, No. 4:12-CV-266-CEJ, 2012 WL 1320147, *1 (E.D. Mo. Apr. 17, 2012). Although the Eighth Circuit has not adopted either formulation, courts within it usually apply the "good cause" standard. *Oglala Sioux Tribe v. Van Hunnik*, 298 F.R.D. 453, 455 (D.S.D. 2014); *see Bonus of Am., Inc. v. Angel Falls Servs., L.L.C.*, No. 10-CV-2111 (DSD/FLN), 2010 WL 2218574, at *4 (D. Minn. May 28, 2010) ("The court finds that expedited discovery is warranted in this case.").

Under the good cause standard, the party seeking expedited discovery must show that the need for expediting, "in consideration of administration of justice, outweighs prejudice to the responding party." *Meritain Health*, 2012 WL 1320147, at *1. Common factors that courts consider include: (1) the existence of a motion for preliminary injunction; (2) the breadth of the request for discovery; (3) the purpose for the request; (4) the burden of compliance; and (5) how far in advance of the usual discovery process the party made the request. *Id.* at *2.

Here, the factors weigh in favor of ordering expedited discovery. A motion for preliminary injunction is pending before the Court. (ECF No. 4.) The discovery request is

narrow, encompassing only the "available names, telephone numbers, email and mailing addresses of John Does #1–10." (ECF No. 9 at 2.) The Voter Organizations seek this information in order to identify any other potential parties to the suit. Due to the narrow nature of the request, the burden of compliance is low. Finally, although the request is made in advance of the usual discovery process, this is not enough to overcome the other factors.

There is good cause here to expedite discovery of the information the Voter Organizations seek. The disclosure of the identities of John Does #1–10 will ensure that all parties to this case receive proper notice of it through service of process.

## CONCLUSION

Based on the foregoing and on all the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. The Voter Organizations' motion for a preliminary injunction (ECF No. 4) is GRANTED;

2. An injunction is hereby entered against Defendants as follows:

   a. Defendants are ENJOINED from: (i) deploying armed agents within 2,500 feet of Minnesota polling places or otherwise monitoring Minnesota polling places both during early in-person voting and on Election Day, November 3, 2020; (ii) threatening to deploy armed agents to Minnesota polling places; and (iii) otherwise intimidating,

14

        threatening, or coercing voters in connection with voting activities in Minnesota;

    b. This Order shall take effect immediately and shall remain in effect until further order of this Court;

3. The Voter Organizations' request (ECF No. 4) for expedited discovery is GRANTED;

4. Within 24 hours of receipt of this Order, Defendants shall provide the Voter Organizations with all available names, telephone numbers, email addresses, and mailing addresses of John Does #1–10, by sending them by electronic mail to Julia Dayton Klein at julia.daytonklein@lathropgpm.com.

Dated: October 29, 2020                          BY THE COURT:

                                                             s/Nancy E. Brasel
                                                            Nancy E. Brasel
                                                            United States District Judge